**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4426

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ARMOND DOWDELL,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Catherine C. Blake, District Judge.
(1:11-cr-00114-CCB-27)

Argued:  September 20, 2013          Decided:  November 7, 2013

Before TRAXLER, Chief Judge, DIAZ, Circuit Judge, and Gina M.
GROH, United States District Judge for the Northern District of
West Virginia, sitting by designation.

Affirmed by unpublished opinion.  Judge Groh wrote the opinion,
in which Chief Judge Traxler and Judge Diaz joined.

**ARGUED:**   Gerald  Chester  Ruter,  Baltimore,  Maryland,  for
Appellant.   Benjamin  M.  Block,  OFFICE  OF  THE  UNITED  STATES
ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Rod J.
Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GROH, District Judge:

Armond Dowdell appeals the district court's denial of his motions to suppress statements and physical evidence. For the following reasons, we affirm.

I.

Since 2006, the Baltimore Police Department ("BPD") and the Drug Enforcement Administration ("DEA") have investigated Dana Bowman and his associates involved in the distribution of heroin and marijuana in the Baltimore metropolitan area. Their extensive investigation included informants; controlled purchases of illegal drugs; search warrants; surveillance; FedEx, UPS, and United States Postal Service shipping data; bank records; and authorized wiretaps on seventeen phone lines.

On March 9, 2011, as a result of the investigation, BPD and DEA officials applied for a search warrant for more than thirty locations. Two BPD detectives and two DEA special agents authored the supporting affidavit for the search warrant application. The detectives and special agents were experienced in investigations of controlled drug substances and familiar with the language, terminology, and street slang used by persons who purchase and distribute illegal drugs.

In the supporting affidavit, the DEA and BPD detailed their investigation of Dana Bowman and his associates for the illegal sales of heroin and marijuana throughout east Baltimore over a five-year period and included transcript excerpts of intercepted calls between Bowman and Dowdell. The detectives, through the overall investigation, concluded that Dowdell's residence at 2601 East Oliver Street was a stash house for narcotics.

The supporting affidavit recounted the following events specific to Dowdell and his residence at 2601 East Oliver Street. On October 14, 2010, detectives intercepted a call between Dowdell and Bowman. During the call, Dowdell and Bowman spoke in slang and code words. For example, when Dowdell asked Bowman "[w]here the rickys at be," the detectives deduced he was asking where the illegal drugs were located. S.J.A. 78. During the same call, Bowman and Dowdell discussed the packaging of a small amount of the drugs located inside the stash house. On October 16, 2010, detectives intercepted a call wherein Bowman asked Dowdell if he had any "more of them dogs" because Treon Brockington wanted to purchase some, referring to a supply of drugs. S.J.A. 80.

On October 19, 2010, detectives intercepted a call between Brockington and Bowman. In that call, Brockington sought to purchase drugs from Bowman. Later that day, Brockington called

3

Bowman to let him know she had arrived at 2601 East Oliver Street. Upon receiving the call, Bowman emerged from his vehicle, walked to Brockington's vehicle, leaned in her vehicle, and appeared to engage in conversation. After the detectives observed this interaction, they conducted a traffic stop of Brockington's vehicle. During the stop, a trained K-9 alerted the detectives to the presence of drugs in Brockington's vehicle, and a detective told Brockington that she would not be arrested if she revealed the drugs. Brockington then surrendered 4.05 grams of marijuana from her front waist-band.

After the traffic stop, Brockington informed Bowman by phone that the police pulled her over and she turned over the drugs. This triggered a flurry of calls from Bowman to the rest of his conspirators, including a call to Dowdell. Bowman told Dowdell that Brockington was just pulled over by the police and she "gave up the shit." S.J.A. 82. Later that day, Bowman called Dowdell and advised him to get the "stuff" out of there. Id. Thereafter, the officers observed a female exit the driver's side of a Chevy Tahoe—known to be operated by Dowdell—parked in front of the stash house, place something in the rear passenger side, and pull away. At approximately the same time, Dowdell contacted Bowman to say he was moving "the stuff." S.J.A. 81-82.

4

The drug-related activities continued throughout 2010 and early 2011. On November 7, 2010, detectives intercepted a call between Bowman and Dowdell wherein Bowman asked Dowdell about the amount of drugs left in the stash house. On February 24, 2011, Bowman's vehicle was parked in the 1500 block of North Luzerne Street, which is around the corner from the suspected stash house.

Based on this information, a state magistrate found probable cause and issued a search warrant for Dowdell's 2601 East Oliver Street residence and more than thirty other locations in the Baltimore area. On March 10, 2011, members of the BPD, DEA, and other law enforcement agencies executed the search warrants. When officers entered 2601 East Oliver Street, Dowdell retreated from the upstairs hallway into the master bedroom and slammed the door. A woman and three children, as well as a barking dog, were in the upstairs hallway at the top of the steps. The woman secured the dog, then she and the children went downstairs. Next, officers ordered Dowdell to come out of the bedroom and placed him in handcuffs. Then, the officers conducted a protective sweep of the upstairs.

After the protective sweep, the officers brought Dowdell downstairs and verbally advised him of his Miranda rights. Dowdell acknowledged that he understood these rights. Dowdell

5

admitted to the officers that he had nine hundred dollars and personal use marijuana stored in his bedroom. During the search, the officers also recovered a loaded gun. When police questioned Dowdell about the gun, Dowdell stated, "[W]ell, you see where I live. You see the neighborhood I live in. It's for my protection." J.A. 112. Law enforcement officers also recovered "a football-size bag of marijuana, which contained smaller bags packaged for street-level distribution." J.A. 112-13.

During the execution of the search warrant, Dowdell remained seated with the woman and children on the couch in the living room area. Detective Benson described the atmosphere of the search as "low key." J.A. 114. He also testified that Dowdell was quiet, cooperative, and friendly throughout the search. Id.

Dowdell filed motions to suppress his statements and physical evidence seized by officers during the execution of the search warrant, which the district court denied. Thereafter, Dowdell entered a conditional guilty plea to a felon-in-possession charge and to conspiracy to distribute and possess with intent to distribute a controlled substance. Dowdell was sentenced to 120 months' imprisonment. This appeal followed.

6

II.

Dowdell argues that the district court erred in denying his motion to suppress evidence seized in the search of his residence. He claims that the supporting affidavit contained conclusory statements and the facts did not establish probable cause. He also contends that the information in the supporting affidavit was stale.

When reviewing a district court's ruling on a motion to suppress, we review the district court's factual findings for clear error and the district court's legal conclusions de novo. United States v. Farrior, 535 F.3d 210, 217 (4th Cir. 2008).

A.

A warrant is constitutionally sound when issued by a neutral magistrate and supported by probable cause. See U.S. Const. amend. IV; Illinois v. McArthur, 531 U.S. 326, 330 (2001). The magistrate's probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Blauvelt, 638 F.3d 281, 288 (4th Cir. 2011) (finding ample evidence in the supporting

7

affidavit "afford[ing] the magistrate a substantial basis upon which to conclude that probable cause existed"). Probable cause is evaluated through a "totality-of-the-circumstances" analysis rooted in common sense. Gates, 462 U.S. at 230.

When reviewing a determination of probable cause, we "must accord 'great deference' to the magistrate's assessment of the facts presented to him." United States v. Montieth, 662 F.3d 660, 664 (4th Cir. 2011) (quoting United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990)). "[P]robable cause involves probabilities-judgment calls that are tethered to context and rooted in common sense." United States v. White, 549 F.3d 946, 947 (4th Cir. 2008). Thus, our inquiry is whether there was a "substantial basis for determining the existence of probable cause." Gates, 462 U.S. at 239.

In this case, two BPD detectives and two DEA special agents authored the supporting affidavit. The four officers were trained and had years of experience in investigations of controlled drug substances. Also, they were familiar with the language, terminology, and street slang used by persons who purchase and distribute illegal drugs.

In reviewing the supporting affidavit, the magistrate was presented with a detailed recounting of law enforcement's investigation of Bowman and his associates, including transcript

8

excerpts of intercepted calls between Bowman and Dowdell. The affidavit provided the transcript excerpts of calls in late 2010 between Bowman and Dowdell. During those calls, Bowman and Dowdell discussed the amount of drugs in the stash house as well as packaging and distributing the drugs. The affidavit also informed the magistrate that the detectives had witnessed a purported drug transaction between Brockington and Bowman and then later seized drugs from Brockington. Therefore, the magistrate had a substantial basis for concluding that probable cause existed under the totality of the circumstances in this case.

Dowdell relies on Greenstreet v. County of San Bernardino to argue that the supporting affidavit and resulting search warrant lacked probable cause. 41 F.3d 1306 (9th Cir. 1994). In Greenstreet, a San Bernardino County Sheriff's Deputy sought a warrant to search Greenstreet's residence at 385 Granada Street, Rialto, California, as well as three other locations in the San Bernardino area. Id. at 1307. The affidavit stated that Greenstreet was observed at 385 Granada Street and listed his criminal history. Id. at 1308. The affiant "believe[d Greenstreet wa]s associated and involved in narcotic activity alon[g] with the other subjects listed in the search warrant" and that the location was "possibly" a place being used to manufacture methamphetamine. Id. at 1309-10. Upon review of

the search warrant and supporting affidavit, the court of appeals found that the supporting affidavit did not establish a sufficient nexus between Greenstreet's criminal history and his current residence. Id. at 1310. Therefore, the court held that the supporting affidavit did not provide a substantial basis for the magistrate's conclusion that the affidavit stated probable cause to search Greenstreet's residence. Id. at 1309-10.

In viewing the totality of the circumstances in this case, we find that the supporting affidavit made the necessary showing of probable cause for issuance of the search warrant. Specifically, we find the supporting affidavit provided a sufficient nexus linking Dowdell's residence as a stash house for controlled substances, which were then distributed by Dowdell and Bowman. The affidavit provided transcripts from several intercepted calls linking Dowdell, Bowman, and illegal drugs to the 2601 East Oliver Street residence. Additionally, law enforcement officials observed a purported drug transaction between Bowman and Brockington immediately outside the stash house and found drugs on Brockington after stopping her. Accordingly, in light of the totality of the circumstances, there was sufficient probable cause to issue the search warrant for 2601 East Oliver Street.

B.

Dowdell argues separately that the information contained in the supporting affidavit was too old to furnish present probable cause. We disagree.

We have stated that "there is no question that time is a crucial element of probable cause. A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (quoting Sgro v. United States, 287 U.S. 206, 210 (1932)). However, the court makes the determination based on the "circumstances of each case." Id. at 1336 (citation omitted).

In assessing the staleness of the information, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." Id. (quoting United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972)); see also United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004) (explaining that staleness is not measured "by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit"). Rather, we consider whether the objects to be seized would still be present due to the ongoing nature of the activity or whether the items

11

sought to be seized are not ordinarily destroyed or moved about from one place to another. See McCall, 740 F.2d at 1336 (stating "the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time"); United States v. Minis, 666 F.2d 134, 140 (5th Cir. 1982) (holding that the ongoing nature of a marijuana-cultivating operation warranted the magistrate's inference that marijuana plants discussed in July would still be present in October); United States v. Freeman, 685 F.2d 942, 951-52 (5th Cir. 1982) (holding that bank records and identification papers are not ordinarily destroyed or moved about, thus avoiding potential staleness problems).

In this case, Dowdell participated in a long-standing, extensive, and ongoing criminal conspiracy to distribute heroin and marijuana throughout the Baltimore area. The supporting affidavit indicated that the drug-related activities were still occurring in 2010 and early 2011. Courts routinely reject staleness arguments in the face of ongoing and continuous criminal activities. See Farmer, 370 F.3d at 439 (denying staleness argument because it was unlikely that Farmer's large-scale counterfeiting operation would have been suddenly abandoned); United States v. Leasure, 319 F.3d 1092, 1099 (9th Cir. 2003) ("When an affidavit 'establish[es] the existence of a widespread, firmly entrenched, and ongoing narcotics operation .

12

. . . staleness arguments lose much of their force.'") (alterations in original) (citation omitted). Therefore, the length of the criminal conspiracy in this matter and the ongoing nature of the criminal activities weigh heavily against Dowdell's staleness argument.

Additionally, law enforcement officials sought to seize from the stash house items associated with the distribution of drugs, such as papers, records, and receipts. Due to the character of this evidence, the magistrate judge made a valid inference that these items evidencing the distribution of drugs would likely be stored in Dowdell's residence and remain there because business records are not ordinarily destroyed or moved about. Accordingly, Dowdell's staleness argument is inapposite on this ground as well.[*]

---

[*] Dowdell also argues that his statements should be suppressed because they are fruit of the poisonous tree. However, the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of <u>illegal</u> searches and seizure. <u>See</u> <u>United States v. Gray</u>, 491 F.3d 138, 154 (4th Cir. 2007) (explaining "[t]he threshold question is whether testimonial evidence is the product of an illegal search") (citing <u>New York v. Harris</u>, 495 U.S. 14, 19 (1990)). Because we have already determined the search was executed pursuant to a valid search warrant, we do not address this argument.

III.

For the foregoing reasons, we affirm the district court's denial of Dowdell's motions to suppress.

<u>AFFIRMED</u>